|   |                                                                      |                                      |
|---|----------------------------------------------------------------------|--------------------------------------|
|   | UNITED STATES DISTRICT COURT                                         |                                      |
|   | DISTRICT OF NEVADA                                                   |                                      |
|   | * * *                                                                |                                      |
|   | UNITED STATES OF AMERICA,                                            | Case No. 3:18-cr-00200-MMD-CWH-1     |
|   | Plaintiff,                                                           | ORDER                                |
|   | v.                                                                   |                                      |
|   | CHARLES MICHAEL GOFF,                                                |                                      |
|   | Defendant.                                                           |                                      |

## I. SUMMARY

Defendant Charles Goff ("Goff") was pulled over by Las Vegas Metro Police Department ("LVMPD") officers for driving a car with an expired registration. Approximately fourteen minutes into the traffic stop, the officers found a gun in the car. Goff was subsequently indicted on one count of felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF No. 1.) The question before the Court is whether the officers had independent reasonable suspicion to take the extra walk around the car Goff was driving that led to discovery of the gun (the "Walk-Around"), because the government has now conceded the officers extended the duration of the traffic stop under *U.S. v. Landeros*, Case No. 17-10217, 2019 WL 166120 (9th Cir. Jan. 11, 2019), which would require the Court suppress the gun in the absence of independent reasonable suspicion justifying the Walk-Around. (ECF No. 53.)

More specifically before the Court is Goff's motion to suppress the gun ("Motion") (ECF No. 19.),[1] and Magistrate Judge Carl Hoffman's Report and Recommendation ("R&R") recommending the Motion be denied (ECF No. 34).[2] Judge Hoffman held an

---

[1] The government filed a response (ECF No. 22), to which Goff replied (ECF No. 25).

[2] Goff filed an objection (ECF No. 39), to which the government replied (ECF No. 40).

evidentiary hearing on October 1, 2018 ("First Hearing"). (ECF No. 27.) The Court held an additional evidentiary hearing on January 25, 2019 ("Second Hearing"), focusing on evidence that emerged after the First Hearing, along with the Ninth Circuit Court of Appeals' intervening decision in *Landeros*. (ECF No. 53.) Because the applicable officer had independent reasonable suspicion for the Walk-Around, and as discussed herein, the Court will deny the Motion. But the Court will also decline to adopt the part of the R&R to which Goff objects because it was based on a rationale the Ninth Circuit rejected in *Landeros*, and did not—likely because it did not need to—squarely consider the question of whether reasonable suspicion existed here.

## II. RELEVANT FACTUAL BACKGROUND

The following facts are taken primarily from the evidence presented at the First Hearing, including testimony of the two LVMPD officers involved in Goff's arrest, Bryant Arevalo and Aaron Brehymer (ECF Nos. 36 at 193), as supplemented by evidence submitted by Goff in support of his Motion, primarily consisting of bodycam footage and the police report created by Officer Arevalo following Goff's arrest (ECF No. 19-1).[3]

Officers Arevalo and Brehymer were on patrol together in Las Vegas, Nevada, early in the morning of August 31, 2017. (ECF No. 19-1 at 2 (Police Report).) They ran the license plate of a red, 2001 Mitsubishi Eclipse (the "Car"), and learned the Car's registration was expired. (*Id.* at 3.) They pulled the Car over. (*Id.*) The Car did not come to an immediate stop after they turned their lights and sirens on, but did eventually stop. (ECF No. 36 at 110.) After pulling the Car over, Officer Arevalo approached the driver's side of the Car, and Officer Brehymer approached the passenger's side. Goff was driving, and Carmen Reyes was riding in the front seat. (ECF No. 19-1 at 8 (Exh. C at, *e.g.*, 0:47).)

Upon approaching the Car, Officer Arevalo asked Goff for his license, and Goff provided it to him, though Goff also mentioned his license was expired. (*Id.* (Exh. C at 0:42-0:49).) Around the same time, Reyes told Officer Brehymer that she was the owner

---

[3]The Court refers to the police report (ECF No. 19-1 at 2-6) as the Police Report for convenience.

2

of the Car, and also that the Car's registration was expired. (*Id.* (Exh. C at 0:55-1:10).) Shortly after that, Officer Brehymer asked Reyes for identification, and she provided him with a driver's license that she noted was expired. (*Id.* (Exh. C at 1:49-2:16).) In the conversation that followed, both Goff and Reyes explained to the officers that they may have pending warrants out for their suspended driver's licenses. (*Id.* (Exh. C at 2:17-2:30 (Reyes); Exh. B at 1:20-1:24 (Goff)).) The officers then returned to their police car, and Officer Arevalo ran a search whose results indicated that, while Goff had no current warrants, he had a number of prior arrests and convictions for crimes involving guns, and other crimes. (ECF No. 36 at 14-16.)

After some discussion in the police car—with their bodycams off—in which they decided to remove Goff and Reyes from the Car, Officers Arevalo and Brehymer went back to the Car and asked Goff and Reyes to step out. (ECF No. 19-1 at 8 (Exh. D at 0:23-1:00).) Officer Arevalo told Goff he was going to give him a citation, presumably for driving a car with an expired registration with an expired license. (*Id.* (Exh. D at 1:00-1:12).) Following Officer Arevalo's orders, Goff exited the Car and walked to the front of the police car. (*Id.* (Exh. D at 1:20-1:30).) Officer Arevalo asked Goff if he had any weapons on him, such as knives. (*Id.* (Exh. D at 1:30-1:34).) Goff replied yes, and directed Officer Arevalo to a knife in his pocket as Officer Arvelo patted him down. (*Id.* (Exh. D at 1:34-1:50).) Officer Arevalo also handcuffed Goff as he patted Goff down. (*Id.*) Then Officer Arevalo asked Goff if he had any other weapons on him, and Goff said, "I don't believe so, sir." (*Id.* (Exh. D at 1:55-2:10).) By this point in time, Officer Brehymer had directed Reyes out of the Car as well, and patted her down by the front of the police car, though he did not handcuff her. (*Id.* (Exh. D at 2:34-3:35).)

Officer Arevalo next got into the passenger seat of the police car and spent approximately seven and a half minutes writing up a citation for Goff. (ECF Nos. 19-1 at 3 (Police Report), 36 at 23-24, 19-1 at 8 (Exh. D at 3:40-11:15 (body cam footage)).) Officer Brehymer remained outside the police car, talking with Goff and Reyes. (ECF No. 19-1 at 8 (Exh. D at 3:40-11:15).) In the body cam footage, it is not possible to see whether

Officer Arevalo is writing anything, but he does set a clipboard with a piece of paper that could be a traffic citation on it down on the dash when he later gets out of the police car. (ECF No. 19-1 at 8 (Exh. D at 11:14-11:16 (setting down the clipboard)).) Officer Arevalo also testified at the First Hearing that he was writing a traffic citation during this time, and that an average traffic citation takes him eight to ten minutes to write. (ECF No. 36 at 23-24.)

In this case, he never finished writing the citation. (ECF No. 36 at 82-83.) All of a sudden, something appeared to capture Officer Arevalo's attention. (ECF No. 19-1 at 8 (Exh. D at 11:14-11:16).) He abruptly left the police car and did the approximately 25-second Walk-Around. (*Id.* (Exh. D at 11:14-11:40).) He then strode back to the police car and handcuffed Reyes (*Id.* (Exh. D at 11:45-12:15).) As it turned out, Officer Arevalo saw (apparently for the first time) a handgun lying half under the passenger-side seat of the Car during the Walk-Around. He specifically spotted the gun as he looked through the windshield of the Car using his flashlight. (ECF No. 36 at 29-30, 89.)

As Officer Arevalo knew from the records check he conducted some minutes prior that both Goff and Reyes were convicted felons who could not have firearms, he read Goff and Reyes their Miranda rights at that point, and then he and other LVMPD officers began a series of interrogations aimed at finding out whose gun he had seen under the seat. (ECF No. 19-1 at 3-5 (Police Report), 8 (Exh. M); *see also* ECF No. 19 at 8-9.)

Officer Arevalo testified that he decided to leave the police car to do the Walk-Around because, while he was writing the traffic citation, he thought that Reyes was acting suspicious—looking at Goff as if for approval before she answered questions—and he heard her decline consent for Officer Brehymer to search the Car. (ECF No. 36 at 84-90.) The conversation between Officer Brehymer, Goff, and Reyes is not audible in Officer Arevalo's body cam footage. (ECF No. 19-1 at 8 (Exh. D at 3:40-11:15).) However, some of it is audible in Officer Brehymer's body cam footage, until the body cam's battery dies. (ECF No. 19-1 at 8 (Exh. E at 3:40-6:23); *see also* ECF No. 36 at 147-151.) Officer Brehymer's body cam did not capture Reyes declining consent to search the Car. (ECF

No. 19-1 at 8 (Exh. E at 3:40-6:23).) But Officer Brehymer testified at the First Hearing, as did Officer Arevalo, that she declined consent to search the Car by saying "do you have to?" (ECF No. 36 at 26-27, 84-87, 150.) Officer Arevalo testified at the Second Hearing that this tipped his suspicion that some other crime had occurred over the edge into reasonable suspicion, prompting him to conduct the Walk-Around. (*See also id.* at 26-27.)

LVMPD officers later allegedly determined the gun belonged to Goff through a written statement obtained from Reyes at the scene (ECF No. 19-1 at 5 (Police Report)), and alleged DNA evidence linking him to one of the bullets in the gun recovered from the Car following the traffic stop (ECF No. 19 at 9). Those alleged connections led to his indictment.

### III. LEGAL STANDARD

Magistrate judges have authority to review and file findings and recommendations on matters referred by the district court, including motions to suppress evidence in a criminal case. LR IB 1-4(h). This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." *Id*. The Court thus accepts the portions of Judge Hoffman's R&R to which Goff does not object and conducts a *de novo* review of the portions of the R&R to which Goff objects.[4]

### IV. DISCUSSION

The Ninth Circuit published *Landeros* between the First Hearing and the Second Hearing. *Landeros* clarified that "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop[, but], he may not do so in a way that prolongs the

---

[4]For example, Judge Hoffman found in the R&R that the gun found in the Car was in plain view, and not the product of a search. (ECF No. 34 at 9.) Goff did not object to this finding. (ECF No. 39.) Thus, the Court does not address herein whether the gun was in plain view, and instead accepts that it was.

stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Landeros*, 2019 WL 166120, at *3 (quoting *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1615 (2015)). *Landeros* rejected some of the reasoning upon which the R&R was based, notably Judge Hoffman's finding that "Officer Arevalo's action of going and looking into Goff's vehicle for 30 seconds did not measurably extend the duration of the stop such that the encounter was converted into an unlawful seizure." (ECF No. 34 at 8-9.) *See also Landeros*, 2019 WL 166120, at *3-*5. *Landeros* made clear that *any* prolongation of the duration of the applicable traffic stop outside the scope of that traffic stop's mission violated the Fourth Amendment—warranting suppression—unless the applicable officer had independent reasonable suspicion for that prolongation. *Landeros*, 2019 WL 166120, at *3-*5. Further, the government conceded at the Second Hearing that *Landeros* meant it had to show Officer Arevalo had reasonable suspicion to conduct the Walk-Around, because the Walk-Around was outside the scope of, and prolonged, the traffic stop.[5] (ECF No. 53.) Therefore, the Court's analysis below focuses exclusively on whether Officer Arevalo had independent reasonable suspicion to conduct the Walk-Around. Because the Court finds that he did, it will deny Goff's Motion.

### a. Governing Law

"Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *Landeros*, 2019 WL 166120, at *5 (9th Cir. Jan. 11, 2019) (citing *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) and *U.S. v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015)) (internal quotation marks omitted). "The requirement of *particularized* suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped*

---

[5]In addition, the government argues that the gun should be admitted under the inevitable discovery rule. Because the Court finds that Officer Arevalo had reasonable suspicion to conduct the Walk-Around, the Court need not, and does not, consider the government's alternative argument.

6

has committed or is about to commit a crime." *Montero-Camargo*, 208 F.3d at 1129 (emphasis in original, internal citations and footnotes omitted).

In determining the totality of the circumstances, the Court must avoid nitpicking factors or disregarding factors altogether unless context renders those factors non-probative. *See U.S. v. Cotterman*, 709 F.3d 952, 970 (9th Cir. 2013) (en banc); *U.S. v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013). Further, the applicable standard of review requires the Court to defer to the inferences drawn by the officers on the scene. *See Valdes-Vega*, 738 F.3d at 1077. Thus, courts in the Ninth Circuit have taken the analytical approach of weighing each factor individually and then collectively to satisfy the totality of the circumstances test. *See, e.g., Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir. 2016), *as amended* (May 5, 2016). "The nature of the totality-of-the-circumstances analysis also precludes us from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case." *Valdes-Vega*, 738 F.3d at 1079 (citing *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002)). "We may conclude that 'some factors in a particular case are more probative than others,' but this evaluation cannot be done in the abstract by divorcing factors from their context in the stop at issue." *Id.* (quoting *Arvizu*, 534 U.S. at 277).

Finally, "[t]he reasonable-suspicion standard is not a particularly high threshold to reach." *Id.* at 1078. "Although . . . a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274). "Reasonable suspicion is a 'commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Ornelas v. U.S.*, 517 U.S. 690, 695 (1996)).

### b. Analysis

Mindful that reasonable suspicion "is not a particularly high threshold to reach" (*id.*), the Court finds that Officer Arvelo had reasonable suspicion Goff had committed

some other crime—there were weapons or contraband in the Car—such that the Walk-Around was constitutionally permissible. The Court first addresses below the individual factors the government presented to show reasonable suspicion existed, and then considers them collectively. The Court then explains why it is not persuaded by several of Goff's arguments that Officer Arevalo lacked reasonable suspicion for the Walk-Around.

### i. Individual Factors

Between the Police Report, the First Hearing, and the Second Hearing, the government has presented a number of factors in support of its argument that Officer Arevalo had reasonable suspicion for the Walk-Around. The Court discusses each factor in turn. First, the officers both testified at the First Hearing that the traffic stop occurred in a high-crime area. (ECF No. 36 at 20, 140.) They also reiterated and provided more reasons why the location of the traffic stop was in a high crime area at the Second Hearing—there, they discussed their experiences with the area, the types of businesses found there, and estimated the number of crimes they have investigated in that area, but did not provide any crime statistics or other quantitative evidence that it is a high crime area. Further, Officer Arevalo did not include this factor in the Police Report. An individual's presence in a high-crime area is a "relevant contextual consideration[]," though "standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also U.S. v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011). Further, "courts should examine with care the specific data underlying any such assertion." *Montero-Camargo*, 208 F.3d at 1139 n.32. Here, the Court gives the high crime area factor minimal weight because it does not stand alone, but rather as one of a number of proffered factors. However, its utility to the reasonable suspicion analysis is limited because the government has not proffered any quantitative evidence supporting the officers' testimony that the stop occurred in a high crime area. That said, the Court considers it amongst the totality of the circumstances.

Second, the Car's registration was expired, and neither Reyes nor Goff had valid drivers' licenses. (ECF Nos. 19-1 at 3 (Police Report), 36 at 85.) Both officers also testified to this at the Second Hearing. "Inability to provide any valid documentation" can contribute to reasonable suspicion. *See U.S. v. Garcia-Rivera*, 353 F.3d 788, 791 (9th Cir. 2003). Thus, the Court gives this factor some weight and considers it as part of the totality of the circumstances.

Third, the Car did not immediately come to a stop when the officers turned on their lights and sirens. (ECF No. 36 at 110.) Officer Brehymer also testified to this at the Second Hearing. However, Officer Arevalo did not mention this in the Police Report. Assuming the failure to immediately stop was intentional, this factor may also be considered in the reasonable suspicion analysis. *See U.S. v. Beard*, 258 F. App'x 143, 144 (9th Cir. 2007). Goff was driving the Car. Failing to come to a stop right away suggests that Goff briefly considered not stopping for the officers, which could suggest to a reasonable officer that he was concerned about what the officers might find once they stopped the Car. Thus, the Court will also give this factor some weight in the totality of the circumstances analysis.

Fourth, Goff had a criminal record. (ECF Nos. 19-1 at 3 (Police Report); ECF No. 36 at 20.) Officer Arevalo also testified at the Second Hearing that Goff's criminal record, which contained firearms offenses, and offenses that appeared violent to him, contributed to his suspicion that Goff was engaged in some sort of criminal activity. However, Goff's most recent conviction was from 2010, for ex-felon in possession of a firearm. (ECF No. 36 at 56.) And a criminal record alone is insufficient to establish reasonable suspicion. *See U.S. v. Daniel*, 804 F. Supp. 1330, 1335 n.10 (D. Nev. 1992) ("an investigative stop cannot be made merely because the person has a criminal record") (citation omitted). Thus, the Court gives this factor little weight in this analysis, though it is still entitled to some because it is only one of a number of factors proffered by the government, and Officer Arevalo repeatedly testified that it influenced his thinking while he was conducting the traffic stop.

Fifth, Goff let Officer Arevalo know that he had a knife in his pocket when Officer Arevalo patted him down. (ECF No. 36 at 19-20.) Officer Arevalo also testified to this at the Second Hearing, and the interaction is visible in the bodycam footage. However, Officer Arevalo did not include this detail in his Police Report. Thus, the Court will consider this factor in its totality of the circumstances analysis, but will give it little weight because the fact that Officer Arevalo did not include this detail in his Police Report suggests he did not think it was important at the time, and the fact that Goff immediately and accurately identified that he had a knife (and where it was) tends to suggest that Goff was not trying to conceal it from Officer Arevalo. It also suggests that the knife posed no threat to Officer Arevalo's safety.[6]

Sixth, during the same pat down, Officer Arevalo asked Goff if he had any other weapons on him, and Goff replied, "I don't believe so, sir." (ECF Nos. 36 at 28, 19-1 at 8 (Exh. D at 1:55-2:10).) Officer Arevalo also testified to this effect at the Second Hearing. However, Officer Arevalo did not mention this detail in his Police Report. Nonetheless, Officer Arevalo testified at the Second Hearing that Goff's response was not reasonable and heightened his safety concerns and suspicion. The Court assigns this factor significant weight in the totality of the circumstances analysis. Most people would know whether or not they had any additional weapons on their person. Officer Arevalo asked Goff a simple yes or no question, and Goff responded with neither. There was also no indication in the bodycam footage or testimony that Goff did not understand the question. Thus, the Court infers that Goff was being evasive in his response to Officer Arevalo's question—and that would make any reasonable officer suspicious. *See U.S. v. Ackerman*, 293 F. App'x 491, 493 (9th Cir. 2008) (considering responses to questions that appeared fabricated among other factors in determining that officers had reasonable suspicion).

Seventh, Officer Arevalo testified that, while he was writing the traffic citation he never finished, he saw Officer Brehymer shine his flashlight into both Goff and Reyes'

---

[6]Officer Arevalo did testify at the First Hearing that the revelation that Goff had a knife posed a safety concern because Goff had earlier responded that he did not have any weapons in the Car when Officer Arevalo first approached Goff. (ECF No. 36 at 66.)

eyes, which he knew to be a type of field sobriety test for narcotics—and the fact that Brehymer conducted this test raised his suspicion. (ECF No. 36 at 77, 118.) Both officers also testified to this effect at the Second Hearing. However, Officer Brehymer also explained at the Second Hearing that Goff and Reyes passed the test, and Officer Arevalo did not mention this test in his Police Report. That said, a reasonable officer in Officer Arevalo's position could infer from the fact his partner initiated this test that his partner believed Goff and Reyes may be intoxicated, which could, in turn, suggest that there were drugs in the Car. Thus, the Court will consider this factor in the totality of the circumstances analysis, but assign it little weight.

Eighth, both officers testified at the First Hearing—and Arevalo wrote in his Police Report—that Reyes was acting nervous when she was answering Officer Brehymer's questions while Officer Arevalo looked on as he wrote the traffic citation. (ECF No. 36 at 26, 27, 72, 163.) They said she looked over at Goff as if she was seeking approval before she answered each question, which the officers thought was odd. (*See id.*) The officers also testified to this effect at the Second Hearing. However, Reyes does not appear any more nervous in the bodycam footage than could be expected during a traffic stop where she was being questioned by police officers in front of a police car, and it is not clear to the Court that she was looking to Goff for approval before answering questions. (ECF No. 19-1 at 8 (Exh. D at 3:40-11:15).) Nonetheless, the Court will give this factor some weight in the totality of the circumstances analysis because: (a) the Court must defer to the officers who were on scene (*see Valdes-Vega*, 738 F.3d at 1077); and (b) while nervousness cannot justify a *Terry* search on its own, it may be considered amongst other factors in determining Officer Arevalo had probable cause for the Walk-Around. *Compare U.S. v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012) *with U.S. v. Rayford*, 180 F. App'x 760, 761 (9th Cir. 2006); *U.S. v. Morneau*, 392 F. App'x 614, 616 (9th Cir. 2010); *Ackerman*, 293 F. App'x 491 at 493; *U.S. v. Arana-Duarte*, 244 F. App'x 121, 122 (9th Cir. 2007).

Ninth, according to the officers, Reyes answered "Do you have to?" in response to Officer Brehymer's request for consent to search the Car. (ECF Nos. 36 at 26-27, 19-1 at

3 (Police Report).) Officer Arevalo could hear this response from within the police car, where he was writing the traffic citation. Officer Arevalo also testified at the Second Hearing that answering with a question instead of yes or no struck him as suggestive that there may be weapons or contraband in the Car, and that this particular response caused him to consider the totality of the circumstances described above, leading him to conclude that he should check the Car once more to see if there were any weapons or contraband in plain view. But "[a] refusal to consent to a search cannot itself form the basis for reasonable suspicion . . . [because] if refusal to consent was a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections." *Thomas*, 818 F.3d at 884-85 (citation omitted). However, the Court will still give this factor some weight in the totality of the circumstances analysis—for two reasons. One, Reyes' response to Brehymer's question is just one of nine reasonable suspicion factors Officer Arevalo testified he considered, and thus the Court may consider it along with the others. Two, Reyes did not exactly refuse consent. She responded with a question, and Officer Arevalo testified that her response with a question was what struck him as suggestive that there might be drugs or contraband in the Car.

### ii. Weighing the Factors Together

Considering the totality of the circumstances discussed above, and again mindful that reasonable suspicion is not a high threshold, the Court finds that Officer Arevalo had reasonable suspicion to conduct the Walk-Around. It was early in the morning. (ECF No. 19-1 at 2 (Police Report).) Officer Arevalo learned Goff was a prohibited person. (ECF No. 19-1 at 3 (Police Report).) Goff also had a criminal record that included firearms-related charges. (ECF Nos. 19-1 at 3 (Police Report); ECF No. 36 at 20.) Goff gave him an ambivalent answer when Officer Arevalo asked if he had any other weapons on him. (ECF Nos. 36 at 28, 19-1 at 8 (Exh. D at 1:55-2:10).) The traffic stop occurred in an area that the officers believed to be a high crime area, and the Car did not come to an immediate stop when they pulled it over. (ECF No. 36 at 20, 110.) The Car's registration was expired, and neither Goff nor Reyes had a valid driver's license. (ECF Nos. 19-1 at

3 (Police Report), 36 at 85.) Reyes appeared nervous (ECF No. 36 at 26, 27, 72, 163), and gave Officer Brehymer an answer that struck Officer Arevalo as suspicious when he asked if they could search her car (ECF Nos. 36 at 26-27, 19-1 at 3 (Police Report)). Officer Arevalo was also attuned to the idea that the traffic stop may have implicated drugs because Officer Brehymer conducted a narcotics field-sobriety check on Goff and Reyes. (ECF No. 36 at 77, 118.) Thus, overall, Officer Arevalo, like any reasonable officer would have under the totality of these circumstances, reasonably suspected that there might be weapons or contraband in the Car. As he had reasonable suspicion, Officer Arevalo's Walk-Around did not violate Goff's Fourth Amendment rights.

### iii. Defendant's Arguments

At the Second Hearing and in his briefing, Goff presented several valid but ultimately unpersuasive arguments as to why Officer Arevalo lacked reasonable suspicion for the Walk-Around. The Court addresses those arguments here. First, Goff argued at the Second Hearing that certain of the reasonable suspicion factors presented by the government are entitled to little weight. He specifically argued that the high crime area factor, Goff's criminal history, Reyes' purported nervousness, and Reyes' declination of consent to search her car with a question—standing alone—are each insufficient to establish reasonable suspicion. However, each of these factors does not stand alone. The Court may—and does—consider them together, especially considering that the government presented five other factors that also contributed to the reasonableness of Officer Arevalo's suspicion.

Goff also argued at the Second Hearing that some of these reasonable suspicion factors are not entitled to much weight because the officers failed to include them in Officer Arevalo's initial Police Report, suggesting that either the officers did not think they were significant at the time, or that the government is now attempting to provide a retroactive justification for the Walk-Around. However, as the government persuasively argued at the Second Hearing, the fact that certain reasonable suspicion factors were not mentioned in the Police Report did not mean they were not present at the time of the stop,

not on Officer Arevalo's mind, or would not have been on the mind of any reasonable police officer presented with these circumstances. Further, the Court must defer to the officers' training, experience, and their on-scene impressions. Here, the officers have been consistent in their testimony that all nine of the factors discussed above contributed to Officer Arevalo's reasonable suspicion—even the factors that were not mentioned in the Police Report. Further, both officers were relatively inexperienced at the time of this stop, and cannot reasonably have been expected to understand how important their description of the reasonable suspicion factors would become in this case. Thus, the Court gives the officers the benefit of the doubt, and finds that the Police Report's omissions are not fatal to the government's case here.

Finally, Goff argued at the Second Hearing that the fact that the officers were planning to merely write Goff a citation, and not arrest him, up until the Walk-Around, suggests that Officer Arevalo did not reasonably suspect that Goff had committed some other crime. The Court asked Officer Arevalo about this at the Second Hearing. He explained that, when he was sitting in the police car writing the traffic citation, the totality of the circumstances described above came together for him, causing him to suspect that there might be weapons or contraband in the car. The Court credits Officer Arevalo's explanation. It was reasonable for Officer Arevalo to change his mind as the traffic stop unfolded and he continually received and processed new information. Thus, the Court is conversely unpersuaded by Goff's argument that Officer Arevalo's intention to write Goff a citation during most of the traffic stop undermines the government's argument that he had reasonable suspicion to conduct the Walk-Around.

In sum, the Court defers to the inferences Officer Arevalo made on the scene and concludes that he had reasonable suspicion to conduct the Walk-Around. Thus, no Fourth Amendment violation occurred warranting suppression, and the Court will therefore deny Goff's Motion.

///

///

### V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Defendant's Motion to Suppress (ECF No. 19) is denied.

It is further ordered that the Court declines to adopt the portion of Judge Hoffman's Report and Recommendation (ECF No. 34) to which Defendant objects because the government conceded at the Second Hearing that the Ninth Circuit's reasoning in *Landeros* rendered Judge Hoffman's reasoning no longer applicable to the facts of this case.

DATED THIS 30th day of January 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE